The STATE of Texas, Appellant

v.

Bobby Lee MORENO, Appellee.

No. 14–08–00556–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 1, 2009.

David Bosserman, Angleton, TX, for appellants.

Samuel Raymond Cammack III, Houston, TX, Tommy James Stickler, Alvin, TX, for appellees.

Panel consists of Chief Justice HEDGES and Justices YATES and FROST.

## OPINION

LESLIE B. YATES, Justice.

Appellee Bobby Lee Moreno was convicted of two counts of aggravated sexual assault and sentenced to five years' community service for each count. Appellee filed a motion for new trial, which the trial court granted. In one issue, the State contends the trial court abused its discretion in granting a new trial. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The complainant and appellee are half brother and sister. Both share the same father, Alfredo Moreno. Appellee lives with his father, his grandparents, two aunts, his father's girlfriend, and two older brothers in a small two bedroom house. When the complainant's mother and father were divorced, the complainant visited her father on alternating weekends, alternating spring breaks from school, and one month during the summer. When the complainant visited her father, she would sleep on a living room couch while her father and his girlfriend slept on an air mattress placed on the floor abutting the couch.

On March 31, 2007, the complainant told her mother, Stacie Estes, that she had vaginal blisters. The complainant was twelve years old at the time. Estes questioned the complainant about whether she had ever had sexual intercourse, which the complainant denied. Estes told the complainant that if she had contracted a sexually transmitted disease, she could die if the disease went untreated. The complainant retreated to her bedroom, and a few minutes later, she returned and told Estes that appellee had sexually assaulted her and forced her to have intercourse the last time she visited her father's house. Estes testified that the complainant was last at her father's house on March 17, 2007.

After reporting the assault to her mother, an emergency room physician examined the complainant and found no physical evidence of abuse. The physician testified, however, that the lack of physical evidence was not indicative of the truth or falsity of the complainant's accusation. The vaginal blisters were a result of an infection and were not caused by sexual activity. The admitting nurse at the hospital noted that the complainant reported the assault had occurred two months prior to the outcry to her mother.

The complainant was subsequently interviewed by a caseworker at the Child Advocacy Center ("CAC"). She told the

caseworker that appellee had assaulted her twice, once when she was eleven years old and the last time when she was twelve years old. She said the assault occurred the last time she was at her father's house, which was six months prior to the outcry to her mother. She first told the interviewer that appellee woke her while she was lying on the living room couch and her father and his girlfriend were lying on the air mattress next to the couch. After he woke her, appellee began to kiss her and put his private part in her private part. She said appellee only stopped because she pushed and kicked him. During the same interview, the complainant said appellee stopped because he saw the lights of a blue van drive up. When the interviewer asked who was driving the van, the complainant said it was her father. The interviewer then asked whether the complainant's father was sleeping on the air mattress or driving the van. The complainant said her father had been sleeping on the air mattress, but had left early in the morning to drive her aunt to work. The complainant also reported another assault in which she alleged appellee forced her to perform oral sex on him, and another instance when appellee kissed her when she was in the first grade.

At trial, the complainant testified that appellee assaulted her in the living room of her father's house two weeks before she made outcry to her mother. She testified that no one in the house witnessed the assault because appellee would stop and pretend to look out of the window when someone in the house awakened. She further testified that appellee kissed her in a back yard shed when no one else was there. During that incident, she said her father came home from the store, which caused appellee to stop. The complainant testified that at other times appellee would force her to perform oral sex on him and that appellee kissed her while she was at her mother's house. The complainant testified that appellee began kissing her when she was in kindergarten, kissed her chest in first grade, kissed her private part in second grade, and put his private part in her private part in third grade. She said that when she was in fourth and fifth grade, he put his private part in her bottom, and in sixth grade, "he would start putting it all together; and he would start kissing me more on my private part." She also testified that she went with her father and appellee to her father's medical appointment, and appellee assaulted her in the van either going to or from the medical appointment.

The complainant's brother was the only witness who observed the abuse. He testified that he saw appellee put his hand in the complainant's pants while they were on the living room couch and that he saw appellee touch the complainant's private parts while they were in a shed in the back yard of their father's home.

In his defense, appellee presented the testimony of his two older brothers, his father, and two neighbors. Appellee's brothers, Michael and Freddie Moreno, testified that they were living with appellee at their father's house at the time the complainant alleged the sexual assault occurred. Both brothers testified that the complainant did not visit their home at all during 2006 or 2007. They further testified that when she and her brother visited, they were never left alone and the complainant always slept in the living room and the complainant's brother always slept in appellee's room. Michael testified that when he was fifteen or sixteen years old, Estes and her sister took him to an adult nightclub. He further testified that he had seen Estes show the complainant pornography on the internet. Michael testified that the complainant's brother never went to the shed at their father's house

and that it was so full of tools, boxes, and gardening implements that appellee and the complainant could not have been in the shed at the time the complainant alleges she was assaulted there.

Alfredo Moreno, the complainant's and appellee's father, testified that neither the complainant nor her brother visited his house after March 2005. He remembered the time because he was sick and could not take care of the children during spring break that year. He testified that because he could not take the children at spring break, Estes became angry with him and denied him visitation after that time. He witnessed Estes showing pornographic pictures to the complainant. Each of the brothers and Alfredo testified that appellee never went to Estes's home. They also testified that the complainant never accompanied appellee and Alfredo to a medical appointment.

On rebuttal, the State called Estes, who testified that the complainant had not been to her father's house on October 31, 2006, six months prior to her outcry. She denied showing pornographic material to her children. Estes testified that she did not deny Alfredo Moreno visitation with the complainant or her brother and that the last time the complainant visited her father was on March 17, 2007.

The jury found appellee guilty on two counts of aggravated sexual assault. During the punishment hearing, the State called the complainant who testified how her life had changed since the incidents of sexual assault. At the conclusion of the complainant's testimony, the State introduced a packet of documents, which contained the complainant's counseling records from the Devereux Texas Treatment Network.

The counseling records revealed the following: The complainant was admitted to Devereux Treatment Center on June 27, 2007, with the notation that she was a "12–year–old female who in March of [2007] came forward with a long history of sexual abuse, stated that she had been abused by her now 23–year–old half brother from the age of 4 until March." She showed increased depression, mood swings, problems at school and "suicidal ideation with a plan." A psychiatric assessment on the day of admission reported the following history:

> [Complainant] is a 12–year–old white female brought in by her mother due to reports of her revealing that she felt that she "messed up her life" and "didn't want to deal with it anymore." She began crying and screaming at home. She reportedly was upset about recent sexual abuse and not remembering what really happened versus what she thought may have happened. [Complainant] is very tearful during the interview and per staff, she has been crying frequently during the day. She rapidly recounts feelings that her mother had put a pillow over her face to keep her from crying even though she is not sure this actually happened. She also is scared that she may endanger her current living environment after telling people about this incident and another incident about her stepfather hitting her. She is unsure but ruminates about feelings that she has done something sexually inappropriate with her 5–year–old sibling "but I really didn't." [Complainant] usually reports feeling happy but has been tearful and crying for the last four days. She admits to suicidal ideation stating "I would jab a pencil in my arm." She admits to sometimes getting mad and as a result begins "yelling and screaming." She admits to engaging in sexual play with a cousin from age 8 to recently. CPS reportedly has been involved in the past.

When the complainant's mother and stepfather were interviewed about the alleged physical abuse, they said that since reporting the sexual assault by appellee the complainant could not "distinguish between what is imagined and what is reality." The complainant thought she had been abused by people other than her half brother. She also admitted that she thought she had inappropriately touched others including her five-year-old brother and a cousin. The reports state that "Each of these persons are shocked and report no such events." The therapist reported that the complainant's grasp of reality and her imagination are "very much confused in her mind." Another entry read, "Patient's larger issue is with talking about doing bad things she has not even done. Therapist now feels this may be partly due to confusion with reality. More due to the attention patient gets from all the talk." The therapist also recognized that the complainant had "false fantasies." The complainant was focused on issues and staying away from someone named Levi who was an admitted pedophile. The complainant was "completely absorbed with sex and everything somehow relates to the topic." The complainant spoke "of sex with her grandmother's dog."

A discharge summary dated July 13, 2007 stated that the complainant was afraid she may endanger her current living environment if she revealed her sexual abuse. She was unsure about her memory, but "ruminates about feelings that she has done something sexually inappropriate with her 5–year–old sibling, but reports 'I really didn't.'" The complainant was admitted as an inpatient, but was transitioned to a partial hospitalization program on July 3, 2007. The discharge summary stated that her only setback was the day she was told she would have to speak with Child Protective Services about the alleged inappropriate touching of her younger sibling.

In an outpatient progress note, the therapist noted that the complainant lacked sexual boundaries. The complainant learned in the session that "it is improper to go up and tell some boy that you like to look at his private area." She also learned that she may not talk about sex continually in most settings. The therapist's notes further recorded that the complainant reported that she had inappropriately touched others, but when those persons were contacted, they expressed shock and reported no such events had occurred.

During the punishment phase, appellee's attorney questioned Estes about the psychiatric records. Estes testified that she did not place a pillow over the complainant's face to keep her from crying, but that the complainant reported to the counselor that she had. The counseling records showed that the complainant had sexual feelings toward a cousin and that she had been engaging in sexual play with her cousin from the time the complainant was eight years old. Estes admitted that the complainant had engaged in sexual play with her eight-year-old cousin, but had not done so with other people. The complainant's cousin admitted that the two girls had kissed. Estes said the complainant did not begin to obsess about sex until after she reported appellee's abuse. Estes denied that the complainant had sex with her grandmother's dog. Appellee's attorney asked Estes whether the story about the dog was "some sort of bizarre fantasy." Estes responded, "Yeah, a little 12 year old girl having some weired [sic] fantasy." When appellee's attorney asked whether one of those "weird fantasies" could have included the complainant's half brother, Estes answered, "Yes."

After deliberating for just over thirty minutes, the jury assessed punishment at five years' community supervision. Appellee filed a motion for new trial in which he alleged he was entitled to a new trial because the verdict was contrary to the law and the evidence and in the interest of justice. The basis of appellee's motion was that a new trial was required in the interest of justice because if the counseling records had been admitted during the guilt-innocence phase of trial, the evidence would have been legally and factually insufficient to support a conviction.

The trial court held a hearing on appellee's motion, at which appellee's attorney stated that twelve to fourteen days prior to trial, the State faxed a one-page document to his office notifying him of the Devereux records. The records were not attached, but the notice stated that the records would be admissible under rule 803(6) or 803(7) of the Texas Rules of Evidence and would be made available by the clerk of the court for inspection and copying. At the conclusion of the hearing, the trial court commented that the effect on the jury of the Devereux records was profound. In granting the motion, the court stated, "The jury obviously, as I told you back there, were telling us that if they had known at the [guilt-innocence] phase what they know now, they would have found him not guilty." At a subsequent hearing on the State's motion for findings of fact and conclusions of law, the trial court found that the motion for new trial was granted because the evidence was legally and factually insufficient to support a conviction. The court further found that a new trial should be granted in the interest of justice.

## II. Analysis

The State appeals the grant of a new trial in a single issue alleging the trial court abused its discretion when it granted appellee's motion. Appellee sought a new trial for the following reasons: (1) the verdict is contrary to the law and the evidence and (2) the interest of justice requires a new trial. In its judgment, the court stated, "On June 9, 2008 came to be heard defendant[']s first amended motion for new trial and the said motion is hereby granted."

## A. State's Allegation of Waiver

■ Initially, the State contends that appellee failed to properly raise his motion for new trial because the motion was not supported by an affidavit. Texas Rule of Appellate Procedure 21 requires that a motion for new trial be: (1) timely filed, (2) properly presented, and (3) adequately verified. The right to a hearing on a motion for new trial is not absolute. *Reyes v. State*, 849 S.W.2d 812, 815 (Tex. Crim.App.1993). As a prerequisite to obtaining a hearing, a motion for new trial must be supported by affidavit, either of the accused or someone else, specifically showing the truth of the grounds of attack. *Martinez v. State*, 74 S.W.3d 19, 21 (Tex. Crim.App.2002). A defendant will be entitled to an evidentiary hearing if his "motion and accompanying affidavit(s) raise matters not determinable from the record, upon which the accused could be entitled to relief." *Lucero v. State*, 246 S.W.3d 86, 94 (Tex.Crim.App.2008).

■ Once the trial court holds a hearing on a motion for new trial in which all facts alleged in the motion can be placed on the record and the credibility of the allegations in the motion can be assessed by the trial court, the need for supporting affidavits is moot. *Cf. Mayo v. State*, 17 S.W.3d 291, 296–97 (Tex.App.-Fort Worth 2000, pet. ref'd) (counsel's failure to file timely motion for new trial became moot when trial court granted hearing on the motion). Therefore, appellee's failure to file an affi-

davit became moot when the trial court held a hearing on the motion for new trial.

## B. Standard of Review

 The granting of a new trial rests within the sound discretion of the trial court. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex.Crim.App.1995). An appellate court will reverse the trial court's decision only when that decision is so clearly wrong as to lie outside the zone in which reasonable persons might disagree. *State v. Provost*, 205 S.W.3d 561, 566–67 (Tex.App.-Houston [14th Dist.] 2006, no pet.). An appellate court is not to substitute its judgment for that of the trial court; rather the appellate court's role is to examine the record to determine whether the trial court granted a new trial without reference to any guiding rules or principles or, in other words, whether the trial court's decision was arbitrary or unreasonable. *See Lewis*, 911 S.W.2d at 7. The appellate court is to presume the trial court correctly granted a new trial, and the State has the burden to establish the contrary. *State v. Belcher*, 183 S.W.3d 443, 447 (Tex.App.-Houston [14th Dist.] 2005, no pet.). We will uphold the trial court's judgment if any appropriate ground exists to support it. *Id.*

## C. Did the trial court abuse its discretion in granting a new trial on the ground that the verdict is contrary to the law and the evidence?

 The granting of a new trial on the basis of factual insufficiency is the equivalent of a trial court granting a motion for new trial because the verdict is against the law and evidence. *See Youens v. State*, 988 S.W.2d 404, 407 n. 2 (Tex.App.-Houston [1st Dist.] 1999, no pet.). Despite the fact that the trial court found the evidence legally and factually insufficient, it does not appear from the court's order that the judge ordered an acquittal,

but granted a new trial. Because the trial court granted a new trial, we presume the court's decision was based on the interest of justice and factual insufficiency. However, because the court found the evidence was legally insufficient during the hearing on findings of fact and conclusions of law, we will review the trial court's decision under a legal sufficiency standard.

 When deciding a motion for new trial challenging the legal sufficiency of the evidence, the trial court applies the appellate legal sufficiency standard of review. *Provost*, 205 S.W.3d at 567; *State v. Savage*, 905 S.W.2d 272, 274 (Tex.App.-San Antonio 1995), *aff'd*, 933 S.W.2d 497 (Tex. Crim.App.1996). Thus, the trial court, viewing the evidence in the light most favorable to the verdict, must determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Provost*, 205 S.W.3d at 567. If the evidence meets this standard, the trial court has abused its discretion in granting the motion for new trial. *Id.* When reviewing the evidence, the trial court may not sit as the thirteenth juror and may not substitute its beliefs for those of the jury. *State v. Hart*, 905 S.W.2d 690, 693 (Tex.App.-Houston [14th Dist.] 1995, pet. ref'd).

 In evaluating the factual sufficiency of the evidence, we view all the evidence in a neutral light and will set aside the verdict only if we are able to say, with some objective basis in the record, that the conviction is clearly wrong or manifestly unjust because the great weight and preponderance of the evidence contradicts the jury's verdict. *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App.2006). Deference is to be given to the fact finder's determinations involving credibility and demeanor of witnesses. *Id.* When considering factual insufficiency as a possible ground for the granting of a new trial, we

must determine whether a finding of factual insufficiency by the trial court would have been an abuse of discretion. *State v. Boyle*, No. 2–03–384–CR, 2004 WL 1598283, at *6 (Tex.App.-Fort Worth July 15, 2004, no pet.) (not designated for publication); *cf. State v. Gill*, 967 S.W.2d 540, 542 (Tex.App.-Austin 1998, pet. ref'd) (holding that when trial court grants motion for new trial on basis of ineffective assistance of counsel, appellate court should review standards of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), through prism of abuse of discretion standard and decide whether trial court's decision to grant new trial was so outside zone of reasonable disagreement that it is subject to reversal).

At the guilt-innocence phase of trial, the State called four witnesses during its case-in-chief. The complainant and her brother both testified that appellee assaulted the complainant in the living room of their father's home where the complainant was sleeping and in the shed in the back yard of their father's home. The complainant's testimony about the timing of the assaults was conflicting. When she first made outcry to her mother, the complainant said the assault happened the last time she was at her father's house. Estes testified that the complainant was at her father's house two weeks prior to the date the complainant told her of the assault. The hospital records reflect that the complainant was last at her father's house two months prior to the outcry. Finally, the complainant told the CAC worker that she had last been at her father's house six months prior to her outcry. Therefore, the evidence showed that the alleged assault took place some time between October 31, 2006 and March 17, 2007. A physician testified that the complainant's physical symptoms were not due to sexual assault but an infection resulting possibly from hygiene issues. The physician also testified that the lack of physical evidence was not indicative of the truth or falsity of the complainant's accusation. The State's fourth witness was the police officer who took the statement of the complainant and her mother. He testified when he first encountered the complainant and her mother, both appeared upset and the complainant was crying.

Appellee presented the testimony of his two older brothers, his father, and two neighbors. The neighbors testified to appellee's law-abiding reputation. Both brothers and appellee's father testified that the complainant did not visit their home in 2006 or 2007. They testified that eight people lived in the two-bedroom home and that the complainant and appellee were never alone. The father and his girlfriend slept on an air mattress within inches of the couch on which the complainant alleged the assault took place. Michael Moreno testified that Estes had shown him and the complainant pornography while at her house. Appellee's brothers and father testified that the shed in the father's back yard was so full of tools, boxes, and gardening implements that no one could go in the shed where the complainant alleged one of the instances of abuse occurred. They further refuted the complainant's testimony that appellee had kissed her at her mother's house or in the van on the way to her father's medical appointment.

 Appellee argues that the evidence is legally and factually insufficient in light of the "dramatic revelations that occurred during the sentencing phase" of his trial. However, in a bifurcated trial before a jury on a plea of not guilty, our consideration of the evidence is necessarily limited to that evidence before the jury at the time it rendered its verdict of guilt. *Barfield v. State*, 63 S.W.3d 446, 450 (Tex.Crim.App. 2001). Therefore, in reviewing whether the

trial court abused its discretion in granting a new trial based on legal and factual insufficiency of the evidence, we may only consider the evidence the jury had before it at the time it reached its guilty verdict.

Applying the appropriate standards of review, we conclude that when the evidence is viewed in the light most favorable to the verdict, there is legally sufficient evidence from which a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Further, when viewed in a neutral light, we find no objective basis in the record for the trial court to determine that the jury's verdict was clearly wrong or manifestly unjust because it was contradicted by the great weight and preponderance of the evidence. While the evidence at guilt-innocence was conflicting, the jury acted within its role as fact-finder to resolve conflicts in the evidence. *See Jensen v. State*, 66 S.W.3d 528, 534 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd) (testimony of a victim, standing alone, even when the victim is a child, is sufficient to support a conviction for sexual assault). In reviewing appellee's motion, the trial court had to presume that the jury resolved those conflicts in favor of the verdict. *See Turro v. State*, 867 S.W.2d 43, 47 (Tex.Crim.App. 1993) (when faced with conflicting evidence, reviewing court presumes the trier of fact resolved conflicts in favor of the prevailing party). Therefore, the trial court abused its discretion in granting the motion for new trial on the grounds of legally and factually insufficient evidence.

**D. Did the trial court abuse its discretion in granting a new trial in the interest of justice?**

"For more than one hundred and twenty years, our trial judges have had the discretion to grant new trials in the interest of justice." *State v. Herndon*, 215 S.W.3d

901, 909 (Tex.Crim.App.2007). The ruling of the trial court is presumed correct, and the burden in this case rests on the State to prove otherwise. *Belcher*, 183 S.W.3d at 447. Having heard the evidence and being present to observe the dynamics of the trial, the trial court is in a better position than an appellate court to evaluate the impact on a jury when evidence bearing on the complaining witness's credibility is injected into the record during the punishment phase of trial.

As a general rule, a trial court will not abuse its discretion in granting a motion for new trial in the interest of justice if the defendant (1) articulated a valid legal claim in his motion, (2) produced evidence or pointed to evidence in the trial record that substantiated his legal claim, and (3) showed prejudice to his substantial rights under the rules of appellate procedure. *Herndon*, 215 S.W.3d at 909; *see* Tex.R.App. P. 44.2. The defendant need not establish reversible error as a matter of law before the trial court may exercise its discretion in granting a motion for new trial. *Herndon*, 215 S.W.3d at 909. A trial court does not have the discretion, however, to grant a new trial unless the defendant demonstrates that his first trial was seriously flawed and that the flaws adversely affected his substantial rights to a fair trial. *Id.*

**1. Valid Legal Claim**

In his motion for new trial, appellee pointed to his assertion of innocence and his inability to cross-examine the complainant with the Devereux records because they were not admitted until the punishment phase of trial. The State argues that the Devereux records, while admissible during punishment, would not have been admissible at the guilt-innocence phase.

■ The State first argues that the records would have been inadmissible under rule 608(b) of the Texas Rules of Evidence. Rule 608(b) prohibits proof through extrinsic evidence on specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than conviction of a crime as provided in Rule 609. TEX.R. EVID. 608(b). However, the credibility of the witness, and the weight to be given his or her testimony, is a matter for the jury to decide. *See* TEX.CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979). The mental capacity of a witness is the proper subject of consideration and impeachment as bearing upon her credibility. *Perry v. State,* 236 S.W.3d 859, 865 (Tex.App.-Texarkana 2007, no pet.). Therefore, rule 608(b) permits the impeachment of a witness with evidence that might go to any impairment or disability affecting the witness's credibility. *Id.*

The State cites several cases in which the court found that evidence of a victim's mental health or previous false accusations was not admissible. *See Lopez v. State,* 18 S.W.3d 220 (Tex.Crim.App.2000); *Lagrone v. State,* 942 S.W.2d 602 (Tex.Crim.App. 1997); *Scott v. State,* 162 S.W.3d 397 (Tex. App.-Beaumont 2005, pet. ref'd). Those cases are distinguishable from the current case in that the medical records sought to be introduced here bear directly on the complainant's credibility.

In *Lopez,* the court held that a prior false accusation of physical abuse was not admissible to impeach the complainant in a subsequent allegation of sexual assault. 18 S.W.3d at 225. The court declined to create a special exception to rule 608(b) for sexual assault cases but held that an allegation of physical abuse was too far removed from the allegation of sexual abuse to be relevant. *Id.* at 226. In *Lagrone,* the court held that evidence of prior drug use was inadmissible as impeachment evidence. 942 S.W.2d at 613. The court found that the party seeking to introduce the evidence must demonstrate an actual drug-based mental impairment during the witness's observation of the crime in order to pursue impeachment of a witness's perceptual capacity with evidence of drug addiction. *Id.* In *Scott,* the court of appeals held that evidence of a witness's recent mental illness was not admissible to impeach his credibility. 162 S.W.3d at 401– 02. The court explained that the mere fact that a witness has in the recent past suffered or received treatment for a mental illness or disturbance does not, for this reason alone, cause this kind of evidence to become admissible impeachment evidence. *Id.* at 401. "If the witness is shown to have been suffering from a recent mental illness, prior to the occurrence of the event in question, and such might be considered a 'persistent disabling disturbance of his mental and/or emotional equilibrium, manifested through persistent maladjustment and more or less irrational, even bizarre behavior and speech,' [citation omitted] whether psychic or organic in origin, then, of course, the trial judge should permit the jury to hear this kind of evidence." *Id.* (quoting *Virts v. State,* 739 S.W.2d 25, 30 (Tex.Crim.App.1987)).

The evidence in the Devereux records not only addressed the complainant's mental state but directly addressed her inability to separate fantasy from reality. The therapist's notes raised the possibility that the complainant had not been abused by her half brother but had created the event in her mind or confused an actual event with fantasy. The State argues that the complainant's inability to separate fantasy from reality did not occur until after the alleged offenses took place. The records, however, are not clear as to the timing or cause of the complainant's psychological issues. While it is true that the complain-

ant was not hospitalized until she made outcry, that is not evidence that her psychological problems did not occur until she was hospitalized. Therefore, the evidence would have been admissible under rule 608(b) to impeach the complainant's credibility.

The State further contends that the Devereux records were inadmissible under rules 403 and 404 of the Rules of Evidence. Rule 404 prohibits the use of character evidence to prove conduct and rule 403 prohibits the use of otherwise relevant evidence if the opponent of the evidence shows that its probative value is outweighed by its prejudicial effect. In support of its assertion that the Devereux records are irrelevant, the State cites *Garcia v. State*, 228 S.W.3d 703 (Tex.App.-Houston [14th Dist.], 2005, pet. ref'd). In that case, the defendant attempted to impeach the complainant by introducing evidence that she made false allegations against her father. *Id.* at 705–06. The defendant sought to introduce the testimony of the complainant's father that the complainant's previous allegations were false. *Id.* This court found the evidence was inadmissible, not because it was irrelevant, but because it was inherently self-serving and unreliable. *Id.* at 706.

In this case, there is no allegation that the evidence is self-serving or unreliable. The evidence is relevant to the complaining witness's credibility. Further, the State fails to show how the probative value of the evidence is outweighed by the danger of unfair prejudice. The Devereux records would have been admissible at the guilt-innocence phase of trial had they been offered.

### 2. Evidence in the Record Substantiated the Claim

During the punishment phase of trial, the Devereux records admitted included the therapist's notation that the complain-

ant was obsessed with sex and discussed several instances in which she thought she had inappropriately touched a cousin, her brother, and her grandmother's dog. The notes also recorded that the complainant had "false fantasies" and confused reality with imagination. Estes testified that the complainant's story about her grandmother's dog was a "weird fantasy." She further admitted that one of the complainant's "weird fantasies" could have included the story of the sexual assault by her half brother.

The circumstances and timing of the alleged sexual assault were hotly contested. According to the testimony at trial, the first event occurred in a two-bedroom house with eight people, only one of whom saw the abuse. The second event occurred in a shed where the same person, the complainant's brother, witnessed the abuse. Appellee's family testified that the complainant had not even been in their house for two years. Even the complainant's mother admitted that the complainant's claim could have been a fantasy. Because the evidence at trial conflicted sharply, the issue of the complainant's credibility was of heightened importance, and the Devereux records were admissible to impeach the complainant's credibility.

### 3. Harm or Prejudice

▮ The trial court had the discretion to grant a new trial if it was persuaded that (1) appellee's first trial was seriously flawed and (2) the flaws adversely affected his substantial rights to a fair trial. *Herndon*, 215 S.W.3d at 909. A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim.App.1997).

The State contends that appellee's trial was not seriously flawed because the rec-

ords were more beneficial to the State than to the defense. In making this argument, the State contends that the records show the complainant's psychological problems were caused by appellee's actions. The State further contends that "a fair reading of the document shows only temporary psychological problems occurring after the abuse, but well before trial." In the records, the complainant reports abuse allegedly occurring when she was four years old. She also reported abuse by individuals other than appellee. The issue of whether the complainant's inability to distinguish reality from imagination occurred prior to the alleged abuse or as a result of it is not conclusively demonstrated by the records alone. Because the records were not introduced until the punishment phase, there was no opportunity for the jury to evaluate when the complainant's issues arose. The records raise the issue of the complainant's credibility, which the jury was entitled to hear at guilt-innocence.

Appellee's trial was seriously flawed and his substantial rights were affected because evidence that directly questioned the credibility of the complaining witness was not admitted during guilt-innocence. Accordingly, we cannot say that the trial court's decision to grant a new trial was so clearly wrong as to lie outside the zone in which reasonable persons might disagree.

### III. CONCLUSION

■ The record is unclear as to whether the trial court granted an acquittal or a new trial. The trial court judge, in granting appellee's motion, stated that he granted the motion because the evidence was legally and factually insufficient, and in the interest of justice. If a trial court grants a motion for new trial on the basis of legal insufficiency of the evidence, double jeopardy prevents the trial court from entering any other judgment than an acquittal. *State v. Savage,* 933 S.W.2d 497, 499 (Tex. Crim.App.1996). We have determined that the trial court abused its discretion in granting the motion for new trial on the basis of legal and factual insufficiency, but that it did not abuse its discretion in granting a new trial in the interest of justice. Therefore, to the extent the record can be read to grant an acquittal on the ground of legal insufficiency of the evidence, the State's issue is sustained. With regard to the grant of a new trial in the interest of justice, the State's sole issue is overruled.

Accordingly, to the extent the trial court granted a new trial in the interest of justice, the court's order granting a new trial is affirmed.